**UNITED STATES of America,
Plaintiff,**

v.

**ANY AND ALL RADIO STATION EQUIPMENT, Radio Frequency Power Amplifiers, Radio Frequency Test Equipment and Any Other Equipment Associated with Or Used in Connection with Any Radio Transmissions on the Frequency of 95.1 MHZ Located at 2151 Jerome Avenue, 2nd Floor Bronx, New York 10453, Defendant–In–Rem,**

**Reverend Fernandito Alejandro, Radio Mission Evangelistica, and Inglesia Pentecostal El Fin Se Acerca, Inc., Clamaints.**

**No. 99 CIV. 0637 WHP.**

United States District Court,
S.D. New York.

March 31, 2000.

Edward Scarvalone, Office of The United States Attorney, Southern District of New York, New York City, for the Government.

Patrick M. Edwards, Constitutional Litigation Associates, Detroit, MI, for Claimants.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

The United States brings this *in rem* action, pursuant to the Federal Communications Act ("FCA"), 47 U.S.C. § 510, seeking forfeiture of radio transmission equipment it seized from Inglesia Pentecostal El Fin Se Acera, Inc., a Pentacostal church in the Bronx, New York ("the Church"). The Government alleges that the defendants were using the seized equipment to operate Radio Mission Evangelistica, a Spanish-language Christian radio station, without a broadcast license, in violation of the FCA. Presently before this Court are claimants' motions to dismiss the complaint and to quash the *in rem* arrest warrant and the Government's motion for summary judgment.

For the reasons set forth below, claimants' motions to dismiss the complaint and

quash the *in rem* arrest warrant are denied, and the Government's motion for summary judgment is granted.

### FACTS

Radio Mission Evangelistica is owned and operated by the Church. Reverend Fernando Alejandro is the president of the Church and the manager of Radio Mission Evangelistica. Radio Mission Evangelistica operates on the frequency 95.1 MHz.[1] The Federal Communications Commission (the "FCC") has not issued a license to anyone in the Bronx, New York, to operate on the 95.1 MHz frequency. (Gov't Rule 56.1 Stmt. ¶ 2.)

On July 15, 1998, the FCC received an anonymous complaint that someone was operating on the 95.1 MHz frequency. (Loginow Aff. ¶ 7.) The next day, the FCC investigated the complaint and discovered that the source of the transmission was the Church. The FCC determined that the field strength of the transmissions exceeded the level permitted for a non-licensed broadcaster under 47 C.F.R. § 15.239(b). (Loginow Aff. ¶¶ 4, 15, 17, 21.) The same day, FCC agents informed Rev. Alejandro that his operation of Radio Mission Evangelistica without a license violated 47 U.S.C. § 301, and that if he continued to operate the radio station he would be penalized. (Loginow Aff. ¶ 11.)

On July 21, 1998, the FCC sent a warning letter to Rev. Alejandro advising him that he was required to obtain a license before operating a radio station. The letter also set forth the penalties for operating an unlicensed radio station. (Loginow Aff. ¶ 12 & Ex. A.) The FCC told Rev. Alejandro to stop broadcasting and warned him that if he continued to operate without a license, the equipment might be seized. (Loginow Aff. ¶ 12 & Ex. A.)

Despite the warning letter, the broadcasts continued. (Gov't 56.1 Stmt. ¶ 13.) On August 4, 1998, FCC agents determined that Radio Mission Evangelistica was still broadcasting on 95.1 MHz. Later that day, the FCC agents met with Rev. Alejandro and told him to stop operating his station because he was violating 47 U.S.C. § 301. (Loginow Aff. ¶ 13.) The agents again warned Rev. Alejandro of the penalties for operating an unlicensed radio station and gave him a second warning letter. (Loginow Aff. ¶ 13 & Ex. B.)

From August 1998 to January 1999, the FCC periodically monitored 95.1 MHz and determined that Rev. Alejandro was continuing to broadcast without a license. (Loginow Aff. ¶¶ 14–19, 21.)

On February 12, 1999, United States Marshals, acting pursuant to an arrest warrant and writ of entry signed by District Judge Alvin K. Hellerstein, seized the radio equipment at the Church.

Claimants subsequently filed a motion to dismiss the complaint and to quash the arrest warrant on the grounds that FCC Regulation 47 C.F.R. § 73.512 prohibiting micro-broadcasting violates the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb ("RFRA"), and their rights under the First, Fourth and Fifth Amendments. In response, the Government moved for summary judgment.[2]

### DISCUSSION

I. *FCC Statutory and Regulatory Licensing Scheme for Radio Broadcast Transmissions*

The purpose of the FCA is to "maintain the control of the United States over all

---

1. Claimants did not submit any affidavits or a Local Rule 56.1 Statement in opposition to the Government's motion for summary judgment. Accordingly, under Local Rule 56.1, the facts as set forth in the Government's Rule 56.1 statement are deemed to be true.

2. The Government contests claimants' standing to challenge the FCC regulations. Specifically, the Government argues that claimants must apply for a Class D license and petition the FCC for a waiver of the rule that precludes micro-broadcast transmissions before challenging the FCC's licensing scheme in federal court. For the purposes of this motion, this Court assumes, without deciding, that claimants have standing, and denies their motions on the merits.

the channels of radio transmission; and to provide for the use of such channels … by persons for limited periods of time, under licenses granted by Federal authority." 47 U.S.C. § 301. In 1927, Congress enacted the federal statutory licensing scheme in response to the chaotic formative years of radio when the private sector controlled the allocation of frequencies. As the Supreme Court explained:

> [i]t quickly became apparent that broadcast frequencies constituted a scarce resource whose use could be regulated and rationalized only by the Government. Without government control, the medium would be of little use because of the cacophony of competing voices, none of which could be clearly and predictably heard.

*Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 376, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). The substantial number of would-be broadcasters makes federal regulation of the broadcast spectrum as necessary today as it was in 1927. *See, e.g., Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 637–38, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).

Until 1978, the FCC licensed low-power "Class D" educational FM stations that could broadcast at less than 100 watts. In 1978, the agency revoked this policy, and changed its rules to provide that "no new noncommercial educational station will be authorized with less power than minimum power requirements for commercial Class A facilities"—that is, 100 watts. 47 C.F.R. § 73.511(a); *and see* 47 C.F.R. § 73.211(a). As a corollary, the FCC provided that no new Class D applications would be accepted for filing. *See* 47 C.F.R. § 73.512(c).

These rules were in effect during the period at issue in this case.[3]

Radio broadcasting in the United States is prohibited without a license from the FCC. *See* 47 U.S.C. § 301. When a broadcaster knowingly and willfully violates the § 301 licensing requirement, the FCA provides several enforcement options. The Government can: (a) institute a criminal prosecution under 47 U.S.C. § 501; (b) file a civil action to enjoin noncompliance with statutory requirements under 47 U.S.C. § 401(a); (c) impose monetary forfeitures to penalize statutory violations under 47 U.S.C. § 503, and/or (d) as was done in this case, seek the seizure and forfeiture of broadcast equipment that is used in unlicensed radio broadcasting under 47 U.S.C. § 510(a).

The FCA provides that the procedures for seizing radio equipment shall be the same as those provided by the supplemental rules for certain admiralty and maritime claims for the arrest of articles *in rem* (the "Supplemental Rules"). *See* 47 U.S.C. § 510(b). The forfeiture of the equipment is governed by the laws applicable to the seizure and forfeiture of property under United States custom laws. *See* 47 U.S.C. § 510(c)(1).

The Supplemental Rules provide that the Government may obtain a warrant for the arrest and seizure of articles *in rem* on filing a verified complaint *in rem*. *See* Supplemental Rule C(6). In the ensuing forfeiture action, the Government bears the burden of demonstrating probable cause for seizing the property. *See* 19 U.S.C. § 1615. If the Government can

---

**3.** During the pendency of this action, the FCC changed its position on micro-broadcasting. *See In re Creation of Low Power Radio Serv.*, FCC 99–6, 14 FCCR 2471, at ¶ 1 (Feb. 3, 1999) (proposing the creation of two new classes of low-power FM radio stations and seeking comment on whether to establish a third class of low power radio service that would operate in the range of 1 to 10 watts); *In re Creation of Low Power Radio Serv.*, FCC 00–19, 2000 WL 85304, at ¶ 1 (Jan. 27, 2000) (authorizing licensing of low-power FM sta-

tions operating at a maximum of 10 watts). Despite this change in policy, claimants will apparently not be eligible for a broadcasting license under the new regulations, since the FCC has announced that micro-broadcasters who had broadcast without licenses in the past will only be eligible for low-power licenses if they voluntarily ceased broadcasting no later than February 26, 1999 "without specific direction to terminate by the FCC," or ceased broadcasting within 24 hours after being advised to do so. *See Id.* at ¶¶ 51–55.

show probable cause, the burden shifts to the claimant to establish by a preponderance of the evidence the existence of a defense to the forfeiture. 19 U.S.C. § 1615.

## II. *Probable Cause*

Here, claimants do not dispute that they were engaged in radio broadcasting and concede that they never obtained a license. (*See* Ans. at ¶¶ 8–23.) The FCC agents determined that on at least five occasions the station was transmitting at field strength levels exceeding the permissible levels for a station to be exempt from the licensing requirements in place at the time. (Loginow Aff. ¶¶ 15, 17, 21.) Accordingly, there is no dispute that claimants were broadcasting in violation of 47 U.S.C. § 301. In addition, it is not disputed that claimants were given multiple verbal and written warnings advising them that their continued operations violated the law and could subject them to penalties provided by the FCA. (Loginow Aff. Exs. A & B.) Nevertheless, claimants continued broadcasting without a license. Further, there is no indication that claimants consulted an attorney or were informed that there was some legal basis to ignore the FCC's warnings. This evidence is sufficient to establish that claimants willfully and knowingly engaged in unlicensed broadcasting. *See, e.g., United States v. Gris,* 247 F.2d 860, 864 (2d Cir.1957) (holding defendant acted willfully and knowingly within the meaning of the FCA because he "knew exactly what he was doing . . . [h]e intended to do what he did, and that is sufficient"); *United States v. Any and All Radio Station*

*Transmission Equip.,* No. 98–1546–CIV–King, slip. op at 3 (S.D.Fla. Nov. 12, 1998) (holding willful and knowing intent established by defendant's continued operation of broadcast equipment after receiving FCC warning letter). Accordingly, the Government has established probable cause to seize claimants' radio broadcast equipment. The burden thus shifts to claimants to demonstrate a defense to the forfeiture.

## III. *Religious Freedom Restoration Act and First Amendment Free Exercise Clause*

RFRA provides that the federal government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb–1(a).[4] However, RFRA provides an exception to this general rule whereby the federal government "may substantially burden a person's exercise of religion" if it "demonstrates that application of the burden to the person is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1(b)(1)and(2).

In enacting RFRA in 1993, Congress sought to restore the "compelling interest" test for defenses to claims that a facially neutral law of general applicability substantially burdens the free exercise of religion—a test that had been abandoned by the Supreme Court in *Employment Div., Dep't of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The statute thus requires courts

---

4. In *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Supreme Court held that RFRA is unconstitutional as applied to state and local governments. Because neither party to this action challenges RFRA as applied to the federal government, this Court assumes, without deciding, that RFRA is constitutional as applied to federal entities. *See, e.g., Carreras v. City of Anaheim,* 768 F.2d 1039, 1042 (9th Cir.1985) ("[F]ederal courts should avoid the adjudication of federal constitutional issues when al-

ternative grounds are available."); *see also Sutton v. Providence St. Joseph Med. Ctr.,* 192 F.3d 826, 833–34 (9th Cir.1999) (assuming, without deciding, that RFRA is constitutional as applied to federal law); *Adams v. CIR,* 170 F.3d 173 (3d Cir.1999) (same), *cert. denied,* —— U.S. ——, 120 S.Ct. 937, 145 L.Ed.2d 815 (2000); *Alamo v. Clay,* 137 F.3d 1366, 1368 (D.C.Cir.1998) (same); *United States v. Grant,* 117 F.3d 788, 792 n. 6 (5th Cir.1997) (same).

to apply the law as set forth in two earlier free exercise cases, *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct.˙1526, 32 L.Ed.2d 15 (1972). *See*, 42 U.S.C. § 2000bb(b)(1); *City of Boerne v. Flores*, 521 U.S. 507, 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997); *Jolly v. Coughlin*, 76 F.3d 468, 474–75 (2d Cir. 1996).

In order to establish a prima facie case under RFRA, claimants must demonstrate that their right to the free exercise of religion has been substantially burdened. *See* 42 U.S.C. § 2000bb–1(a); *Jolly*, 76 F.3d at 476. The Second Circuit defines a "substantial burden" as one that puts "pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* at 477; *United States v. Amer*, 110 F.3d 873, 879 n. 1 (2d Cir.1997).

Here, claimants contend that they operate the radio station "primarily to act as [disciples] and to spread the word of the Lord Jesus Christ." (Cl. Br. at 14.) According to claimants, it is a "central tenant [sic] of Christianity, and especially the Pentecostal sect, that the church member share the teachings of Jesus Christ to convert humankind to act and believe in accordance with the one true philosophy and view of the world, the teachings of Jesus Christ." (Cl. Br. at 14.) Claimants assert that the FCC regulation prohibiting the distribution of Class D licenses significantly inhibits a central tenant of their belief—spreading the word of Jesus Christ "as thoroughly and profoundly as possible"—because they cannot afford to obtain a Class A, B or C broadcast license. (Cl. Br. at 14, Cl. Resp. Br. at 15–16.) Claimants also assert that since there have been no complaints that their radio station was causing interference in the airwaves, the FCC regulation is not the least restrictive means of avoiding chaos on the airways.

 This Court accepts claimants' assertions that the central tenet of their religion is to spread the word of Jesus Christ as thoroughly as possible. *See Jol-*

*ly*, 76 F.3d at 468 (a court's "scrutiny extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature"). However, claimants have˙not demonstrated that the FCC's moratorium on Class D licenses and the prohibition on operating a radio station without a license puts pressure on them to modify their behavior and violate their beliefs. Claimants do not assert that the FCC regulations prevent them from obtaining any broadcast license; they merely contend that the Class A, B and C licenses are beyond their financial wherewithal. Under claimants' theory, their inability to afford television, satellite or cable licenses, or even commercials during the Super Bowl, would also substantially burden their religion. *See Henderson v. Stanton*, 76 F.Supp.2d 10, 14–15 (D.D.C. 1999) (National Park Service regulation restricting commercial sales on the National Mall does not substantially burden the observance of evangelical Christians, who fulfilled religious requirement that the gospel be communicated by all means by selling t-shirts on the Mall; "[i]f plaintiffs are unable to disseminate their message by t-shirts on federal parkland in Washington, DC, it is not on the basis that the regulation bars the distribution of message-bearing t-shirts, but on the basis that plaintiffs lack the financial resources to distribute their t-shirts for free"); *cf.*˙ *Jimmy Swaggart Ministries v. Board of Equalization of Cal.*, 493 U.S. 378, 391, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990) ("to the extent that imposition of a generally applicable tax merely decreases the amount of money appellant has to spend on its religious activities, any such burden·is not constitutionally significant"); *Bob Jones Univ. v. United States*, 461 U.S. 574, 603–04, 103 S.Ct. 2017, 76 L.Ed.2d 157 ("Denial of tax benefits will inevitably have a substantial impact on the operation of private religious schools, but will not prevent those schools from observing their religious tenets."); *Branch Ministries v. Rossotti*, 40 F.Supp.2d 15, 25 (D.D.C.1999) (IRS's revo-

cation of Church's tax exempt status does not substantially burden free exercise of religion under RFRA; while revocation of tax-exempt status will make it less likely that people will contribute money to the church and imposes a burden on church's ability to engage in partisan political activity, plaintiffs were offered the choice to either engage in partisan political activity and forfeit tax-exempt status or refrain from political activity and retain tax-exempt status; "the fact that plaintiffs may now have less money to spend on their religious activities ... is insufficient to establish a substantial burden on their free exercise of religion").

Claimants' contention that their inability to micro-broadcast violates their religious beliefs because they must spread the word as "thoroughly and profoundly" as possible is also unpersuasive. This Court notes that one district court has found that the FCC's moratorium on Class D licenses substantially burdens a Pentacostal ministry's religious mandate to proselytize. *See United States v. Any and ALL Radio Station Transmission Equip. (103 Street Lancaster, Pennsylvania),* No. Civ. A. 99–2260, 1999 WL 718646, at *3 (E.D.Pa. Aug.31, 1999)(Bartle, J.). However, this Court does not find the *103 Street Lancaster, Pennsylvania* court's cursory analysis of this issue persuasive. In this day and age there are numerous means of communication, many less costly and less regulated than the broadcast spectrum. It can hardly be said that the FCC's practice of restricting Class D licenses and the FCA prohibition on broadcasting without a license operates as a wholesale ban or otherwise significantly impedes claimants' ability to effectively spread the gospel. *Cf. Storm v. Town of Woodstock,* 944 F.Supp. 139, 146 (N.D.N.Y.1996) (town resolution prohibiting parking on road to meadow where religious ceremony is held does not substantially burden plaintiffs' religious observance; even though the regulation

"undoubtedly makes access to the [meadow] less convenient for plaintiffs on full moon evenings, it neither prevents full moon gatherers from practicing their religion nor significantly burdens their ability to do so"). Moreover, the true impediment to claimants' ability to proselytize over the airwaves is not the FCC's moratorium on Class D licenses, but claimants' inability to afford a more expensive license. (*See* page 13 above.) Accordingly, claimants' RFRA challenge is rejected.[5] Claimants' free exercise clause challenge is also rejected, since even under the standards set forth by the Supreme Court in *Sherbert* and *Wisconsin,* claimants have not established that the FCC regulation at issue substantially burdens their exercise of religion.

## IV. First Amendment Freedom of Speech Challenge

■ Claimants argue that the FCC regulation prohibiting the issuance of new Class D licenses for low-power broadcasters violates their freedom of speech.

In *Free Speech ex rel. Ruggiero v. Reno,* 200 F.3d 63, 64 (2d Cir.1999), the Second Circuit recently held that the FCC's policy of not issuing Class D licenses does not violate the First Amendment. The Second Circuit explained that "the Government's allocation of the radio spectrum is not subject to public forum analysis." *Id.* Regulation of protected expression in a nonpublic forum is reviewed for reasonableness so long as it is viewpoint neutral. *See id.* Here, the licensing scheme set forth in FCA is viewpoint neutral. *See id.* It is also well established that the licensing scheme is reasonable. *See, e.g., National Broad. Co. v. United States,* 319 U.S. 190, 226–27, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) (holding that because radio is a medium with inherent limitations and everyone who might seek to broadcast cannot, the

---

5. Because the FCC's regulation of Class D licenses does not require that claimants modify their religious behavior and does not

violate their beliefs, this Court need not determine whether the Government has demonstrated a compelling interest.

"right of free speech does not include ... the right to use the facilities of radio without a license"); *FCC v. Sanders Bros. Radio Station,* 309 U.S. 470, 474, 60 S.Ct. 693, 84 L.Ed. 869 (1940) ("Unless Congress had exercised its power ... to bring about allocation of available frequencies and to regulate the employment of transmission equipment the result would have been an impairment of the effective use of these facilities by anyone."); *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 637, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) ("[I]f two broadcasters were to attempt to transmit over the same frequency in the same locale, they would interfere with one another's signals, so that neither could be heard at all.").

Accordingly, claimants' First Amendment free speech challenge is dismissed.

## V. *Fourth Amendment Challenge*

■ Claimants argue that their radio equipment is presumptively protected by the First Amendment, and therefore, under *Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989), the *ex parte* seizure of that radio equipment is prohibited by the Fourth Amendment.

In *Fort Wayne Books,* the Supreme Court stated that "while it is the general rule under the Fourth Amendment that any and all contraband, instrumentalities and evidence of crimes may be seized on probable cause, it is otherwise when materials presumptively protected by the First Amendment are involved." *Id.* at 63, 109 S.Ct. 916 (1989). It is this passage that claimants rely on in arguing that the *ex parte* seizure of their radio equipment was prohibited. However, this case is easily distinguishable from *Fort Wayne Books.*

*Fort Wayne Books* was an obscenity case. In *Fort Wayne Books,* the Indiana police, pursuant to an *ex parte* warrant, padlocked an adult bookstore and seized its contents pursuant to an Indiana State RICO forfeiture statute. *See id.* at 51, 109 S.Ct. 916. The trial court had authorized the *ex parte* seizure based on a local police officer's affidavit that recounted 39 criminal convictions involving the defendants, described other books and films for sale at the bookstores believed by the affiant to be obscene and alleged a conspiracy among petitioner's employees and officers who had previous convictions for obscenity offenses. *See id.* at 52, 109 S.Ct. 916. The Supreme Court found that exclusive reliance on a police officer's assessment of what is obscene is not sufficient to warrant seizure of presumptively protected speech, *i.e.,* the books. Thus, the Court required that additional measures be taken to insure that defendants' First Amendment rights were protected.

The Supreme Court's concerns in *Fort Wayne Books* with the trial court's reliance on a police officer's bald assertion that books were obscene are not present in this case. First, unlike the books in *Fort Worth Books,* which are without a doubt "speech", the instruments used to violate the FCC law requiring a license to broadcast are not presumptively protected by the First Amendment. The content of the radio equipment is simply not at issue in this case. Nor is the content of claimants' speech. Thus, on this ground alone, the additional inquiry set forth in *Fort Worth Books* is not required.

However, even if the radio equipment were presumptively protected, this case does not fall within the parameters of *Fort Worth Books.* This is not an obscenity case. The subjective analysis inherent in determining whether materials are obscene are not present where the inquiry is whether radio equipment is being used to broadcast without a license. In order to find probable cause that 47 U.S.C. § 301 was being violated, Judge Hellerstein only had to be convinced that claimants were using or operating any apparatus for the transmission of energy or communications or signals by radio from one place in New York to another place in the same State, or to another state, or to a variety of other

locations. *See* 47 U.S.C. § 301. No subjective determination was necessary to make this inquiry. The criteria for issuing the warrant in this case require a factual, not a legal conclusion. Indeed, claimants' do not dispute the facts. Since the concerns underlying obscenity warrants do not exist here, the traditional warrant requirement is sufficient in this case. *Cf. Boggs v. Rubin,* 161 F.3d 37, 41 (D.C.Cir. 1998) (holding that notice prior to seizure of counterfeiting materials is not required under *Fort Worth Books* because no subjective analysis is required in determining whether the materials were being used to violate the counterfeiting statute), *cert. denied,* —— U.S. ——, 120 S.Ct. 45, 145 L.Ed.2d 40 (1999).

This case is factually more akin to a seizure of instruments which may be used to reproduce copyrighted material in violation of the Copyright Act. *See* 17 U.S.C. § 509 (copies of copyrighted works or devices to illegally reproduce such works may be seized and forfeited to the United States in accord with the procedures relating to the "seizure, summary and judicial forfeiture, and condemnation of vessels, vehicles, merchandise, and baggage for violations of the customs laws"). Probable cause alone is sufficient to issue a warrant under § 509. *See, e.g., United States v. One Sharp Photocopier,* 771 F.Supp. 980, 983 (D.Minn.1991). For all of the foregoing reasons, this Court finds that the issuance of the arrest warrant in this case did not violate claimant's Fourth Amendment rights.

## VI. *Fifth Amendment Challenge*

■ Finally, claimants argue that the FCA forfeiture provisions violate their due process rights.

In *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court set forth three factors to consider in evaluating due process claims. The factors are: (1) the interests of the claimant, (2) the risk of erroneous deprivation absent the benefit of the procedures sought and the probable value of such additional safeguards, and (3) the government's interest in avoiding the burdens entailed in providing the additional procedures claimed. *See id.* at 334–35, 96 S.Ct. 893; *Abdullah v. Immigration & Naturalization Serv.,* 184 F.3d 158, 164 (2d Cir. 1999), *petition for cert. filed,* 68 U.S.L.W. 3480 (Jan. 10, 2000) (No. 99–11); *United States v. All Assets of Statewide Auto Parts, Inc.,* 971 F.2d 896, 902 (2d Cir.1992) (applying *Mathews* analysis to forfeiture action).

The Second Circuit has noted that in contrast to criminal prosecutions, where the defendant has the protection of the reasonable doubt standard and double jeopardy, the property owner in forfeiture actions has the burden of proof, and hearsay is admissible to prove the "guilt" of the property. *See All Assets of Statewide Auto Parts,* 971 F.2d at 903–04. The Second Circuit expressed concern that the procedural ease of forfeiture actions would lead the government to use them "as a substitute—or perhaps as a dry run—for ... criminal prosecutions[s]." *Id.* at 903. Bearing in mind the Circuit's warning that *ex parte* seizures are disfavored, this Court will address each *Mathews* factor seriatum.

### A. *Clamaints' Interest*

Claimants allege that the private interest at stake is "paramount: Claimant's [presumably Rev. Alejandro's] ability to exercise his First Amendment Rights." (Cl. Br. at 28.) However, claimants do not have a First Amendment right to broadcast without a license. (*See* cases cited in Part IV above.) Claimants also argue that they have a substantial interest in "continuing to provide the Hispanic community in the Bronx with culturally poignant music, information and news that has largely been ignored by mainstream broadcast stations." (Cl. Br. at 29.) As claimants note, however, this interest is not claimants' interest, but rather the interest of Radio Mission Evangelistica's listeners.

Further, claimants have not explained how their listener's interest in broadening the variety of listening options on the radio spectrum is a property interest.

This Court notes that claimants have a property interest in the radio equipment. Although claimants have not argued this point, a commercial property interest, while not as strong as a defendant's interest in his home, is capable of being offended by an overly intrusive seizure. *See, e.g., All Assets of Statewide Auto Parts,* 971 F.2d at 902. However, in contrast to *All Assets of Statewide Auto Parts* where the Government seized defendant's business, here, the Government did not seize the entire radio station, only the broadcasting equipment. Thus, the extent of the invasion was less significant than in *All Assets of Statewide Auto Parts.* The first factor, therefore, does not weigh in claimants' favor.

**B. *The Risk of Error and Value of Additional Safeguards***

The risk of error of an erroneous deprivation in this action was minimal. The Second Circuit has stated that " 'an *ex parte* probable cause determination before a judicial officer reduces the possibility of an erroneous deprivation', even though 'preseizure notice and an opportunity to be heard would certainly further minimize that risk.' " *Id.* at 903 (quoting *United States v. Premises and Real Property at 4492 S. Livonia Rd.,* 889 F.2d 1258, 1265 (2d Cir.1989)); *accord, United States v. 141st St. Corp.,* 911 F.2d 870, 875 (2d Cir.1990). Here, in conjunction with its application for an arrest warrant, the Government filed a thorough affidavit by Serge Loginow, Jr., the FCC enforcement officer who personally investigated this case. (Scarvalone Decl. Ex. A.) In his affidavit, Loginow recounted in detail the FCC's investigation and the facts which formed the basis for the FCC's determination that claimants were broadcasting without a license. (*See* Scarvalone Decl. Ex. A: Loginow Aff. ¶¶ 7–21.) More im-portantly, claimants do not dispute that they were broadcasting without a license. The Government did not receive an *ex parte* arrest warrant until Judge Hellerstein made an independent determination based upon Loginow's detailed affidavit and the verified complaint *in rem* that the Government had probable cause to seize claimants' radio equipment. Accordingly, the risk of an erroneous deprivation in this case was minimal.

In addition, while pre-seizure hearings provide additional safeguards and are generally preferable to an *ex parte* seizure, in this case the probable value of a pre-seizure hearing would have been minimal. The Government gave claimants' notice twice in person and twice in writing that broadcasting without a license violates 47 U.S.C. § 301, and warned claimants of the penalties that could be imposed if they continued to broadcast illegally. Claimants could have sought a declaratory judgment in federal court or a ruling from the FCC. However, they did not avail themselves of any legal options, choosing instead to wait for the Government to act before asserting their rights. Further, claimants have had the opportunity to be fully heard in the current motions before this Court. In sum, the second factor also does not weigh in claimants' favor.

**C. *The Government's Interest***

In assessing the strength of the Government's interest in obtaining pre-notice seizure, courts look to whether exigent or extraordinary circumstances are present by referring to the factors set forth in *Fuentes v. Shevin,* 407 U.S. 67, 91, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). *See All Assets of Statewide Auto Parts,* 971 F.2d at 903. Exigent circumstances are present when: "(1) the seizure is necessary to secure an important governmental or public interest, (2) very prompt action is necessary, and (3) a government official initiated the seizure by applying the standards of a narrowly-drawn statute." *Id.* at 903 (cit-

ing *Fuentes v. Shevin,* 407 U.S. at 91, 92 S.Ct. 1983.)

Here, there is no dispute that claimants continued to broadcast without a license despite numerous warnings from the Government. *See, e.g., United States v. Puello,* 814 F.Supp. 1155, 1163 (E.D.N.Y.1993) (evidence that alleged criminal activity is ongoing is sufficient to demonstrate Government's interest in taking action to prevent continuation of the criminal activity). Moreover, the Government's interest in allocating licenses for the spectrum is well established and has been noted by the Supreme Court. Lack of control over the spectrum allocation would result in pandemonium. The fact that claimants' illegal broadcasting was not interfering with another legitimate broadcast does not lessen the public's interest in the preservation of its ability to receive important news and other valuable speech without the risk that it will be rendered unintelligible by an unlicensed broadcaster transmitting on the same or close frequency as a licensed broadcaster. *See* Stephen LaBaton, *F.C.C. Heads For Showdown With Congress Over Radio Plan,* N.Y. Times, March 27, 2000, at C1–2 (noting that interference may result when a low frequency station, such as a micro-broadcaster, broadcasts too closely to a high frequency station).

The next consideration—the necessity of prompt action in this case—also weighs in the Government's favor. Here, the radio equipment could have been easily concealed or moved to another jurisdiction. *See Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 679, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (authorizing pre-notice seizure of yacht "since the property seized—as here, a yacht—will often be of a sort that could be removed to another jurisdiction, destroyed, or concealed, if advance warning of confiscation were given").

---

**6.** This Court notes that "an illegal seizure of property does not immunize that property from forfeiture," rather, the remedy is suppression of any evidence obtained as a result of the unlawful seizure in the forfeiture proceeding. *All Assets of Statewide Auto Parts,*

Further, the remedial options present when real property is seized, such as a receivership, occupancy agreement or a *lis pendens,* were not viable in this case.

Finally, the Government initiated the seizure by applying the standards of a narrowly-drawn statute—47 U.S.C. § 301.

In sum, although claimants have a property interest in the radio equipment, on balance, the *Mathews* factors weigh heavily in the Government's favor. Accordingly, this Court finds that the *ex parte* seizure of claimants' radio equipment did not violate claimant's due process rights.[6]

### CONCLUSION

None of claimants' statutory or constitutional arguments establish a meritorious defense to the Government's forfeiture of their radio broadcast equipment. Accordingly, for the reasons set forth above, the Government's motion for summary judgment is granted and claimants' motions to dismiss the complaint and to quash the *in rem* arrest warrant are denied.

SO ORDERED:

---

971 F.2d at 905. The suppression of the radio equipment in this case would not effect the determination that claimants were operating a radio station in violation of 47 U.S.C. § 301.